UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ANDREW J. MENDOLIA,

                          Plaintiff,

     -against-                      **MEMORANDUM & ORDER**

                                                   10-CV-0417 (ENV)
MICHAEL J. ASTRUE, Commissioner of Social
Security,

                        Defendant.
------------------------------------------------------------------x

VITALIANO, D.J.

       Plaintiff Andrew J. Mendolia seeks review, pursuant to 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for disability insurance benefits under the Social Security Act (the "Act"). He demands as relief that the Court reverse the Commissioner's decision and that his case be remanded solely for the calculation of benefits. The parties have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons discussed below, the Commissioner's motion is denied and Mendolia's cross-motion is granted to the extent that this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum and Order.[1]

---

[1] While this motion was *sub judice*, plaintiff moved to stay these proceedings pending the outcome of *Padro v. Astrue*, Defendant, No. 11-cv-1788 (CBA) (RAM), an action in which he appears to be a class member. The relief he expects to achieve as a result of a proposed settlement in *Padro* is a remand of his disability benefits case for reconsideration. The application is denied as moot.

## Background

I.  Procedural History

On February 14, 2007 Mendolia filed an application for disability insurance under the Act based on neck, back, and leg pain. He alleged a disability onset date of May 26, 2006. (Tr. at 64-67.)[2] The Social Security Administration ("SSA") denied the application on May 17, 2007, finding that his "condition [was] not severe enough to prevent [him] from working." (Tr. at 32, 39.) Mendolia then requested and was granted a hearing, which was held on September 16, 2008 before Administrative Law Judge Manuel Cofresi ("the ALJ") in Jamaica, New York. (Tr. at 46-50). Mendolia, who was and remains represented by counsel, appeared and testified at the hearing. (Tr. at 17-31).

In a written decision, dated January 20, 2009, the ALJ denied Mendolia's claim, concluding that he was not disabled within the meaning of the Act during the relevant time period. (Tr. at 8-16). The ALJ's ruling became the final decision of the Commissioner on December 22, 2009, when the Appeals Council denied Mendolia's request for review. (Tr. at 1-3). Mendolia timely filed this action on February 1, 2010.

II. Factual Background

Mendolia is a 56- or 57-year-old man with high school education. (Tr. at 21).[3]

---

[2] Citations to the underlying administrative record are designated as "Tr.".

[3] At the hearing on September 16, 2008, Mendolia reported that he was then 52

2

He is married with one child. (Tr. at 20-21). For 20 years, he was employed as a sanitation worker, retiring on May 26, 2006 due to severe back pain. (Tr. at 20-21). He is currently supported by a small pension and his wife's part-time secretarial work. (Tr. at 21, 26).

### a. Dr. Goldstein's Examinations and Medical Opinion

The record reveals that on nine occasions between October 31, 2006 and July 31, 2008, Mendolia visited Dr. Mitchell Goldstein, a board-certified orthopedic surgeon who treated him for chronic pain in his lower back and right leg. (Tr. at 124-136). Based on his examinations of Mendolia, as well as X-ray and MRI studies,[4] Dr. Goldstein diagnosed Mendolia with spondylolisthesis and stenosis. (Tr. at 112-13, 124-136). He recommended a course of treatment that variously included medication, exercise, weight loss, back support, ice and heat therapy, and a number of physical activities. (Tr. at 124-136). He also discussed with Mendolia the possibility that surgical intervention and/or epidural steroid injection might be necessary. (Tr. at 134, 136). Over the course of his nine appointments with Dr. Goldstein, Mendolia reported little to no variation in his symptoms, and Dr. Goldstein's examination results and treatment recommendations were essentially consistent with Mendolia's complaints. (Tr. at 124-136).

On July 25, 2007 and September 11, 2008, Dr. Goldstein completed residual

---

years old. (Tr. at 20).

[4] The MRI report was prepared for Dr. Goldstein by Dr. Eliezer Offenbacher. Dr. Offenbacher interpreted the MRI as showing both stenosis and spondylolisthesis. (Tr. at 112-13).

capacity assessments for Mendolia. In the 2007 assessment, Dr. Goldstein opined that, on account of his spondylolisthesis, Mendolia could lift no more than five pounds and for no more than 20 minutes at a time over the course of an eight-hour workday, and that he could neither stand nor sit for more than two hours per workday or 20 minutes at a time. (Tr. at 122). He also found that Mendolia could not climb, balance, stoop, crouch, or crawl, and that he was impaired in his ability to reach, bend, push, pull, or kneel. (Tr. at 123). Finally, he asserted that Mendolia was limited in his ability to withstand work environments involving height, moving machinery, temperature extremes, humidity, or vibration. (Tr. at 123). With minor variations, the 2008 assessment effectively mirrored the earlier evaluation. (Tr. at 138-39). In the second assessment, Dr. Goldstein concluded that Mendolia was "totally disabled," and could not "bend, lift over 5 lbs., twist[], turn[], squat[], sit[]," or "sleep w/o disturbance + worse in the morning," and observed that Mendolia "[h]as difficulty with daily living." (Tr. at 139).

### b. The ALJ's Ruling

After conducting the hearing and reviewing Mendolia's medical records, the ALJ issued an opinion on January 20, 2009 denying plaintiff's claim for disability benefits. Although he found that Mendolia had a severe impairment—spondylolisthesis—the ALJ ruled that Mendolia's condition was not one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 10-11). On the basis of the ALJ's own review of the medical evidence, Dr. Goldstein's recommended treatment option, Mendolia's various daily activities, the length and

duration of his medical appointments, and his initial five-month delay in seeking treatment after retiring, the ALJ concluded that "[t]he claimant's alleged limitations are grossly exaggerated." (Tr. at 14). He determined that Mendolia "retained the ability to occasionally lift up to fifty pounds, frequently lift and/or carry objects that weigh up to twenty-five pounds, sit up to six hours in an eight-hour workday with normal breaks, stand and/or walk up to six hours in an eight-hour work day with normal breaks and use his hands to grasp, hold and turn objects and he retained the ability to perform medium work." (Tr. at 14). Given these building blocks, the ALJ found that Mendolia had the residual capacity to perform the entire range of medium work, and, considering Mendolia's age, education, and work experience, denied his claim for disability benefits. (Tr. at 15).

In reaching this conclusion, the ALJ discounted Dr. Goldstein's opinion evidence entirely, stating that his "assessment and opinion that the claimant is disabled and is unable to work are not supported and are not given any weight." (Tr. at 14). The ALJ justified this decision on the following astonishing grounds. First, "Dr. Goldstein . . . recommended that the claimant use a back support with heavy lifting and thereby indicated the claimant retained substantial residual functional capacity." (Tr. at 14). Second, "when asked whether the claimant was disabled from regular duties or work, Dr. Goldstein stated that the claimant was retired." (Tr. at 14). Third, "Dr. Goldstein recommended swimming, yoga, pilates and home exercise." (Tr. at 14). Finally, "[m]ost importantly, Dr. Goldstein's assessment . . . [is] not supported by the clinical and diagnostical findings"—that is,

by the results of Dr. Goldstein's own examinations of Mendolia and the MRI study that he ordered and considered in treating Mendolia. (Tr. at 14). Notably, the ALJ did not reference any medical experts that held contrary opinions to that of Dr. Goldstein, but rather relied upon his own assessment of the same medical data that Dr. Goldstein considered in reaching his conclusion.

Mendolia now argues that the ALJ committed legal error by not granting controlling weight to Dr. Goldstein's medical opinion, and seeks remand simply for a calculation of benefits. (Pl.'s Mem. at 11-12).[5] At the same time, Mendolia assigns plain error to the ALJ's failure, before finding that benefits were properly denied, to fully and fairly develop the record. (*Id.* at 15-16).[6] The Commissioner opposes Mendolia's motion and moves that the ALJ's decision be affirmed. (Def.'s Mem. at 14-21).

---

[5] Although Mendolia requests remand solely for a calculation of benefits, "[s]uch a remedy is an extraordinary action and is proper only when further development of the record would serve no purpose." *Rivera v. Barnhart*, 379 F.Supp.2d 599, 604 (S.D.N.Y. 2005). Here, the Court cannot say that the further development of the record would be pointless. Indeed, plaintiff himself faults the ALJ for failing to fully develop the record. Hence, full remand is appropriate. If, however, to achieve the ends of the administrative process at the SSA's reforming and improving Jamaica office, the Commissioner agrees in *Padro* that the class of cases (including Mendolia's) that are the subject of review require remand for a calculation of benefits only, then such broader relief shall supersede the relief ordered here.

[6] Mendolia also asserts that the ALJ did not support his residual function capacity assessment with substantial evidence, and that he failed to show that Mendolia could perform alternate work in the economy. (Pl.'s Mem. at 13-7). Because the Court finds that remand is justified on other grounds, it is unnecessary to address these issues at this time. Should the claimed error be repeated on remand, the objection may be renewed on subsequent appeal.

## Discussion

I.  **Legal Standards**

   a. *Standard of Review*

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, the reviewing court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Courts are advised to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

### *b. Standards for Entitlement to Benefits*

To be eligible for disability benefits, a claimant must establish that he was disabled within the meaning of the Act prior to the expiration of his insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). The SSA has promulgated a five-step sequential analysis that an ALJ must use to determine whether a claimant qualifies as disabled. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits his work-related activities. *Id.* § 404.1520(a)(4)(ii). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. *Id.* § 404.1520(a)(4)(iii). Fourth, if the impairment does not meet or equal a listed impairment, the ALJ must resolve whether the claimant has the residual functional capacity to perform his past relevant work.[7] *Id.* § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. *Id.* §§ 404.1520(e); 404.1545. Fifth, if the claimant cannot perform his past work, the ALJ considers the residual functional capacity assessment and the claimant's age, education, and work experience to determine if there is other work that the claimant could perform. 20

---

[7] Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

C.F.R. § 404.1520(a)(4)(v).

In compliance with this regulatory scheme, the Commissioner must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999). The claimant bears the burden of proof as to the first four steps, while the Commissioner must prove the final step. *See, e.g., Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

II. Legal Errors Mandate Remand

   *a. The ALJ Failed to Develop the Record*

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). This duty exists even when, as here, the claimant is represented by counsel. *Id.* Regulations issued by SSA described this duty thusly: "[b]efore we make a determination that you are not disabled, we will develop your complete medical history . . . [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). The regulations explain that, when confronted evidence that is inconsistent or insufficient, the ALJ will take at least one of four steps: he may (1) recontact the treating physician to seek clarification; (2) request additional records; (3) ask the claimant to undergo a consultative examination; or (4) seek additional information from the claimant or

9

others. 20 C.F.R. § 404.1520b(c).

As discussed earlier, the ALJ granted no weight to Dr. Goldstein's "assessment and opinion that the claimant is disabled and is unable to work." (Tr. at 14). It is apparent that the ALJ discounted entirely not only Dr. Goldstein's judgment that Mendolia is "totally disabled," but also Dr. Goldstein's medical opinion as to the extent and nature of Mendolia's impairment. (Tr. at 14, 122-23, 138-39). Total disregard for Dr. Goldstein's findings is underscored by the drastic differences between Dr. Goldstein's and the ALJ's residual functional capacity assessments. Where Dr. Goldstein determined that Mendolia could lift no more than five pounds and only for short periods, the ALJ found that Mendolia could "occasionally" lift up to 50 pounds and "frequently" lift up to 25 pounds. (Tr. at 14, 122, 138). Dr. Goldstein concluded that Mendolia could neither stand nor sit for more than two hours total in a work day and for no more than 20 minutes at a time, while the ALJ found that Mendolia could stand and sit for up to six hours per workday with normal breaks. (Tr. at 14, 122, 138). Finally, the ALJ found that Mendolia could grasp, hold, and turn objects, which diverges from Dr. Goldstein's medical judgment that Mendolia was impaired in his ability to reach, bend, push, and pull. (Tr. at 14, 123, 139). The disagreement between the ALJ and Dr. Goldstein as to extent and severity of Mendolia's impairment could not be more plain. The basis for the disagreement could not be more obscure.

An ALJ who grants no weight to a treating physician's opinion has, as the Second Circuit teaches, an affirmative obligation to recontact the physician for

further information or clarification prior to issuing a decision. *See Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (holding that "even if the clinical findings [supporting the treating physician's opinion] were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*" on account of the ALJ's "affirmative obligation to develop the administrative record"); *see also Rosa*, 168 F.3d at 79 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."); *Clark*, 143 F.3d at 118 (ALJ was required to seek clarifying information from physician after determining that the doctor's second RFC assessment for the claimant was inconsistent with medical evidence provided in his earlier report).

District courts have followed the drumbeat of cases like *Schaal*, *Rosa*, and *Clark*. *See, e.g., Hartnett v. Apfel*, 21 F.Supp.2d 217, 221 (E.D.N.Y.1998) ("[I]f an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly"); *McDowell v. Colvin*, No. 11–CV–1132 (NAM/VEB), 2013 WL 1337152, at *10 (N.D.N.Y. March 11, 2013) ("Moreover, to the extent the ALJ believed [the treating physician's] opinion was inadequately supported by objective findings and/or motivated by extrinsic considerations , . . . he had an obligation to re-contact the treating physician before giving 'no weight' to his opinion."); *Ewald v. Comm'r of Soc. Sec.*, No. CV-05-4583 (FB), 2006 WL 3240516, at *2 (E.D.N.Y. Nov. 9, 2006) ("[E]ven if correct evaluation of the medical records revealed inadequate support for [the treating physician's]

11

opinion, the ALJ's duty was to recontact [him] to fully develop the record.") (internal citations omitted).

In this case, the ALJ discounted Dr. Goldstein's opinion as to the nature and extent of Mendolia's impairment entirely on the basis of perceived inconsistencies in the record.[8] As discussed on p. 4, *supra*, the ALJ concluded that some of Dr. Goldstein's recommended forms of treatment (a back brace for lifting, yoga, pilates, and home exercise) were inconsistent with his RFC findings, and that Dr. Goldstein's statement that Mendolia had left his job because he had "retired" somehow belied the findings used to support his the RFC determination. (Tr. at 14). He also asserted that "Dr. Goldstein's assessment . . . [is] not supported by the clinical and diagnostical finding." (Tr. at 14). Yet these findings consisted exclusively of Dr. Goldstein's own reported examinations of Mendolia, plus the MRI that Dr. Goldstein ordered and the results of which were reported directly to him for his use and consideration in treating Mendolia.

As *Schaal* and similar cases have held, the ALJ was required to contact Dr. Goldstein to resolve any perceived inconsistencies in his medical opinion before granting that opinion zero weight. The ALJ failed to do this. There is no call log or

---

[8] Unlike the ALJ, the Court sees no internal inconsistency in Dr. Goldstein's medical opinion. His treatment recommendations do not necessarily conflict with his conclusion that Mendolia was totally disabled, since physical exercise such as pilates, yoga, and swimming may be performed at any level, even by those who cannot perform work in the national economy. His statement that Mendolia had "retired" actually *supports* Mendolia's claim for disability, since Mendolia retired on account of back pain. Finally, as discussed in Section II.b, *infra.*, contrary to the ALJ's layperson's judgment, the medical and diagnostic data support Dr. Goldstein's conclusion regarding Mendolia's disability status.

record of a follow-up conversation with Dr. Goldstein. Indeed, there is no evidence in the record that the ALJ even attempted to initiate contact with Dr. Goldstein. Accordingly, the ALJ did not fulfill his legal duty to develop the record in the face of alleged inconsistencies. This was plain legal error, and remand on this basis alone would be necessary.[9]

### b. *The ALJ Violated the Treating Physician Rule*

Under SSA regulations, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa*, 168 F.3d at 78-79 (citing 20 C.F.R. § 404.1527(c)(2)). This dictate is known as the Treating Physician Rule. Although "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," since that question is ultimately reserved for the Commissioner, the treating physician's opinion as to *"the nature and severity of [a claimant's] impairment(s)"* is determinative if it is "well supported by medically acceptable

---

[9] In 2012, the SSA modified its regulations to provide ALJs with three additional options for resolving record inconsistencies other than contacting the treating physician. *See* 20 C.F.R. § 404.1520b(c)(1)-(4); *see also* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651 (Feb. 23, 2012). Because this regulatory change postdated the hearing and the ALJ's opinion, the earlier standard applies, requiring contact with the treating physician. *See Long v. Colvin*, No. 12–CV–610 (FB), 2013 WL 3013667, at *4 n.8 (E.D.N.Y. June 18, 2013) ("Although new regulations took effect on March 26, 2012, the version in effect when the ALJ adjudicated the claim applies to this Court's review.") (citing *Lowry v. Astrue*, 474 F. App'x 801, 805 n. 2 (2d Cir.2012)). In any event, the ALJ here did not pursue any of the new options provided in § 404.1520b(c)(2)-(4), either.

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(c)(2)) (emphasis in original). The Second Circuit has previously determined that a treating physician's RFC assessment for a claimant relates to the nature and severity of the impairment, and hence is to be accorded controlling weight under the Treating Physician Rule. *See, e.g., Sanders v. Comm'r of Soc. Sec.*, No. 11–2630–cv, 2012 WL 6684569, at **2-3 (2d Cir. Dec. 26, 2012) (where ALJ had not justified his failure to accord controlling weight to treating physician's RFC assessment, remand was in order); *Burgin v. Astrue*, 348 Fed.Appx. 646, No. 08–1062–cv, 646, 2009 WL 3227599, at *2 (2d Cir. Oct. 08, 2009) (remand required because ALJ had ignored treating physician's RFC assessment entirely).

This Rule makes unequivocally clear that, "[w]hile an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who testified before him." *McBrayer v. Sec'y of Health and Human Serv.*, 712 F.2d 795, 799 (2d Cir. 1983). That is, "the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion" in analyzing the treating physician's report." *Rosa*, 168 F.3d at 79 (internal quotations omitted). "A circumstantial critique by a non-physician, however thorough or responsible, must be overwhelmingly compelling" to justify a denial of benefits." *Id.* (internal quotations omitted).

*Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998) illustrates this principle starkly. There, the ALJ had rejected the opinions of treating physicians on the grounds that they "allegedly conflicted with the physicians' own clinical findings," concluding that they "were not well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at 80-81 (internal quotations omitted). However, as the court noted, "the Commissioner failed to offer and the ALJ did not cite *any* medical opinion to dispute the treating physicians' conclusions that [the claimant] could not perform sedentary work." *Id.* at 81 (emphasis in original).Rather, the ALJ had engaged in his own analysis of the medical issues, "improperly set[ting] his own expertise against that of physicians who submitted opinions to him." *Id.* (internal quotations omitted). This, the court held, was legal error requiring a remand.

Here, the ALJ acted in precisely the same manner. In his written decision, the ALJ states that his "most important[]" reason for rejecting Dr. Goldstein's opinion was that it was "not supported by the clinical and diagnostical findings." (Tr. at 14).[10] Yet the ALJ did not rely on a different physician's evaluation of the same (or any other) findings to reach this conclusion, but, instead, relied on his own review

---

[10] As previously noted, the ALJ's other reasons for rejecting Dr. Goldstein's opinion were his recommended treatments for Mendolia, which the ALJ considered to be too vigorous to support the physician's RFC assessment, as well as his statement that Mendolia had left his job because he had retired. (Tr. at 14). Although the ALJ described several other factors in evaluating the claimant's RFC (such as Mendolia's daily activities and his occasional visits to New Jersey), he did not cite these among his reasons for rejecting Dr. Goldstein's medical opinion (Tr. at 14). To describe them as inconsistent would, as previously noted, be dubious at best.

and analysis of the medical evidence. (*See* Tr. at 13-14). The Second Circuit made clear in *Rosa* that "as a lay person, the ALJ simply was not in a position to know whether" the medical data supported the treating physician's conclusions. *Rosa*, 168 F.3d at 79 (internal quotations omitted). Succinctly, the ALJ substituted his own judgment for that of Dr. Goldstein, which the Treating Physician rule forbids.[11]

The only other physician whose name appears anywhere else in the record is Dr. Eliezer Offenbacher, who conducted the MRI scan of Mendolia's back and prepared an interpretive report for Dr. Goldstein. (Tr. at 112-13). Nowhere does Dr. Offenbacher offer an opinion that contradicts Dr. Goldstein's conclusions. On the contrary, Dr. Offenbacher found evidence of both spondylolisthesis and stenosis, consistent with Dr. Goldstein's diagnoses. (Tr. at 113). In fact, the objective testing performed by Dr. Offenbacher was used by Dr. Goldstein to inform his diagnosis and treatment plan. The ALJ does not reference Dr. Offenbacher anywhere in his opinion. Certainly, the ALJ's assertion that "the MRI conducted in November 2006 did not reveal an impairment that resulted in compromise of a nerve root or of the

---

[11] Included in the record is an RFC assessment for Mendolia conducted by an intake disability examiner named "M. Pagan" on April 19, 2007. (Tr. at 114-121). It is unclear what the qualifications of this individual are and whether or not he or she is a licensed physician. Although the ALJ made passing reference to this RFC in his opinion, he did not analyze or reference its results or appear to rely upon them in reaching his conclusion. In any event, even if the examiner were a physician, his or her RFC could not constitute substantial evidence sufficient to undermine Dr. Goldstein's opinion. *See Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence.") (internal quotations omitted).

spinal cord," (Tr. at 13), is directly at odds with Dr. Offenbacher's diagnosis of "moderate bilateral neural foraminal stenosis," (Tr. at 113), a condition that affects the nerve root and the spinal canal.[12]

Simply put, the ALJ's rejection of Dr. Goldstein's medical opinion was nothing more than "[a]circumstantial critique by a non-physician." *Rosa*, 168 F.3d at 79 (internal quotations omitted). His reasons for rejecting that opinion were not persuasive, let alone "overwhelmingly compelling." *Id.* He therefore failed to justify granting less than controlling weight to Dr. Goldstein's assessment of Mendolia's RFC, which, plainly, violated the Treating Physician Rule. Reversal and remand is unavoidable.

Even if the ALJ *had* articulated a valid basis for granting less than controlling weight to Dr. Goldstein's opinion, he still would have committed legal error. "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to

---

[12] "Spinal stenosis can be defined as a narrowing of the spinal canal," often resulting in "compression of the neural elements"—that is, nerve roots." Raymond M. Wolfe, et al., Lower Back Pain § 2-4(c) (3d ed. 2000). When this occurs, "the patient will experience symptoms not only of low back pain as mediated through the sinuvertebral nerve supply . . . but also radiating pain in the distribution of compressed neural elements." *Id.* The absence of pain indicates that "the neural elements have enough room to escape pressure." *Id.* Hence, Mendolia's chronic lower back pain and the MRI results confirming stenosis necessarily implies that his condition involved a compression of the nerve roots in his spine, contrary to the ALJ's unsupported assertion.

give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2));[13] *see also Schaal*, 134 F.3d at 504-05 (2d Cir. 1998) (ALJ's failure to provide "good reasons" for discounting a treating physician's medical opinion is legal error). These factors are:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)).[14] The regulations also specify that the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *accord id.* § 416.927(c)(2).

In determining Mendolia's entitlement to disability insurance benefits, the ALJ discounted Dr. Goldstein's medical opinion without conducting the required five-factor analysis to assess how much weight it deserved. That failure was yet additional legal error. Had the ALJ fairly and properly considered these factors, it is highly unlikely that he would have found valid reason to grant Dr. Goldstein's opinion *no* weight, given Dr. Goldstein's regular and extended treating relationship with Mendolia, whom he treated for conditions relevant to his specialty in orthopedics, and especially given the consistency between his findings and Dr.

---

[13] This regulation has since been renumbered 20 C.F.R. § 404.1527(c)(2).

[14] *See* n. 13, *supra.*

Offenbacher's MRI analysis. Consequently, even if the ALJ had justified his decision to discount Dr. Goldstein's opinion—which he did not do— he would still have violated the Treating Physician Rule by failing to analyze how much weight that opinion merited under the requisite factors.

## Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied, and Mendolia's cross-motion is granted to the extent that the ALJ's decision is reverse and the matter remanded for further proceedings before a different ALJ consistent with this Memorandum and Order.

So ordered.

Dated: Brooklyn, New York
June 24, 2013

s/ ENV
_____
ERIC N. VITALIANO
United States District Judge